## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| **A.A.**, by and through his mother, P.A.; **B.B.**, by and through her mother, P.B.; **C.C.**, by and through her mother, P.C.; **D.D.**, by and through his mother, P.D.; **E.E.**, by and through his mother, P.E. | * | CIVIL ACTION NO.: |
| | * | |
| | * | JUDGE: |
| | * | |
| | * | |
| | * | MAGISTRATE: |
| *Plaintiffs,* | * | |
| v. | * | CLASS ACTION |
| | * | |
| REBEKAH GEE, in her official capacity, as Secretary of the Louisiana Department of Health, and the LOUISIANA DEPARTMENT OF HEALTH | * | |
| | * | |
| | * | |
| | * | |
| *Defendants.* | * | |

*******************************************

## COMPLAINT

## I.    INTRODUCTION

1. Plaintiffs A.A., B.B., C.C., D.D., and E.E., are child Medicaid recipients with disabilities who bring this action on behalf of themselves and all other similarly-situated individuals against Defendants, Louisiana Department of Health (LDH), and its Secretary, Dr. Rebekah Gee, for their failure to provide an accessible statewide mental health system of intensive home and community-based services (IHCBS), including: intensive coordination, crisis services, and intensive behavioral services and supports, necessary to correct or ameliorate their mental illnesses or conditions.

2. Decades of research and experience in other states has led to a consensus among mental health practitioners throughout the nation that IHCBS are much more effective and less expensive option than institutionalizing children and youth who have ongoing mental health needs or who experience a psychiatric crisis.

3. Children and youth with mental illnesses or conditions who are left untreated or undertreated have an increased risk of chronic physical conditions and a shorter life

expectancy than those who do not have a mental health condition. These children often experience struggling self-esteems, strained family and peer relationships, languishing in school, and becoming involved with the juvenile-justice system. Therefore, for Plaintiffs and the proposed Class— approximately 47,500 Louisiana Medicaid-eligible children and youth under the age of 21 with a mental illness or condition, a significant number of whom are children and youth with severe emotional disturbances—IHCBS are necessary to lead functioning and productive lives.

4. Unfortunately, rather than provide necessary IHCBS, Defendants have implemented a fragmented, inadequate, and uncoordinated mental health system for Louisiana Medicaid children and youth with gaps in service coverage, availability, and accessibility; a lack of coordination between and among behavioral health providers and child-serving systems; and minimal medication management with infrequent counseling. Resultantly, Plaintiffs and the Class deteriorate in their homes and/or cycle in and out of emergency rooms and psychiatric facilities away from their families and communities. Their conditions either worsen or do not improve, and they become unnecessarily institutionalized or at serious risk thereof. This cycle, by itself, is traumatic for these children.

5. Defendants' failure to provide Plaintiffs and the Class with the necessary IHCBS, on a consistent and statewide basis, violates the Early and Periodic Screening, Diagnostic, and Treatment (EPSDT) provisions and the Reasonable Promptness provisions of Title XIX of the Social Security Act (Medicaid Act), 42. U.S.C. § 1396, *et seq*. The resulting unnecessary institutionalization, or the serious risk thereof, violates Title II of the Americans with Disabilities Act (ADA), Section 504 of the Rehabilitation Act of 1973 (Section 504), and their implementing regulations.

6. Defendants know that the State has failed to ensure that Louisiana Medicaid children and youth under the age of 21 with a mental illness or condition receive the necessary IHCBS that federal law requires it to provide:

   a. In November 2014, Mental Health America (MHA) released its annual report, in which it ranked Louisiana last in the nation (51st out of the 50 states and the District of Columbia) in providing access to mental health care for children with a mental illness or condition. *Parity of Disparity: The State of Mental Health*, Mental Health America, (2015), https://www.mhanational.org/sites/default/files/Parity%20or%20Disparity%202015%20Report.pdf at 32.

   b. In a *Shreveport Times* news article published January 2016 entitled, *Watchdog: Children's mental health services shortage puts them at risk*, The Honorable Paul Young of the Juvenile Court of Caddo Parish, who, according to the article, established "the state's first mental health court for children with severe mental or behavioral challenges," is quoted as stating, "Our mental health system is definitely broken. If you don't have [the mental health court], kids get placed and have to stay in detention, which is expensive . . ." (d. Jan. 2, 2016), https://www.shreveporttimes.com/story/news/2016/01/02/childrens-mental-health-services-shortage-puts-children-risk/77697114/ (last viewed Nov. 6, 2019).

   c. In February 2018, the Louisiana Legislative Auditor (Legislative Auditor) released a performance audit report (February 2018 LDH Audit) evaluating the accessibility of mental health services for both adult and children Louisiana Medicaid recipients, concluding that "Louisiana does not always provide Medicaid recipients with

comprehensive and appropriate specialized behavioral health services." *Access to Comprehensive and Appropriate Specialized Behavioral Health Services,* Louisiana Legislative Auditor (February 14, 2018), https://www.lla.la.gov/PublicReports.nsf/B99F834BF8F4AB908625823400758F9B/ $FILE/000179B4.pdf at 7 (last viewed Nov. 6, 2019); and

    d.  According to the 2017-2018 National Survey of Children's Health conducted by the Health Resources and Services Administration of the U.S. Department of Health and Human Services, 62.6 percent of all Louisiana children between the ages of 3 through 17 who have been diagnosed with a mental illness or condition have not received mental health treatment or counseling. *National Outcome Measure 18: Percent of children, ages 3 through 17, with a mental/behavioral condition who receive treatment or counseling*, Data Resource Center for Child & Adolescent Health, https://www.childhealthdata.org/browse/survey/results?q=7286&r=20 (last viewed Oct. 29, 2019).

7. Plaintiffs and the Class cannot wait any longer for Defendants to fulfill their legal mandate to provide them with the IHCBS that they desperately need. Accordingly, Plaintiffs, individually and on behalf of the Class, seek prospective injunctive relief ordering Defendants to provide necessary IHCBS to correct or ameliorate their conditions and prevent their unnecessary institutionalization.

## II.     JURISDICTION AND VENUE

8. This Court has subject matter jurisdiction under 28 U.S.C. § 1331 and § 1343 to hear claims arising under the Medicaid Act, Title II of the ADA, and Section 504.

9. This Court has jurisdiction to order the declaratory and injunctive relief sought in this action, as well as other relief that is "further necessary and proper" under 42 U.S.C. §

1983, 42 U.S.C. § 12133, 29 U.S.C. § 794a, 28 U.S.C. §§ 2201-2202, Rules 57 and 65 of the Federal Rules of Civil Procedure, and 42 U.S.C. § 1988.

10. At all times, Defendants acted under color of law.

11. Venue in the United States District Court for the Middle District of Louisiana is proper under 28 U.S.C. § 1391(b) because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

## III.    THE PARTIES

*Plaintiffs*

## A.A. (East Baton Rouge Parish)

12. Plaintiff, A.A., is an 11-year-old Medicaid recipient residing in East Baton Rouge Parish, Louisiana, who has been diagnosed with multiple mental illnesses and conditions. He brings this action by and through his mother, P.A. Due to Defendants' failure to ensure the provision of IHCBS, A.A. has repeatedly cycled in and out of hospitals and psychiatric institutions that are located hundreds of miles away from his family; and therefore, is at serious risk of being unnecessarily institutionalized.

## B.B. (Caddo Parish)

13. Plaintiff, B.B., is a 13-year-old Medicaid recipient residing in Caddo Parish, Louisiana, who has been diagnosed with multiple mental illnesses and conditions. She brings this action by and through her mother, P.B. Due to Defendants' failure to ensure the provision of IHCBS, B.B.'s mental health needs have gone untreated to the point that she is at serious risk of unnecessary institutionalization.

## C.C. (Terrebonne Parish)

14. Plaintiff, C.C., is a 13-year-old Medicaid recipient residing in Terrebonne Parish, Louisiana, who has been diagnosed with multiple mental illnesses and conditions. She

brings this action by and through her mother, P.C. Due to Defendants' failure to ensure the provision of IHCBS, C.C. has repeatedly cycled in and out of hospitals and psychiatric institutions that are located hundreds of miles away from her family, and she has become juvenile-justice involved. Because of Defendants' failures, C.C. is at serious risk of being unnecessarily institutionalized.

**D.D. (Rapides Parish)**

15.  Plaintiff, D.D. is a 13-year-old Medicaid recipient residing in Rapides Parish, Louisiana, who has been diagnosed with multiple mental illnesses and conditions. He brings this action by and through his mother, P.D. Due to Defendants' failure to ensure the provision of IHCBS, D.D.'s mental health needs have gone untreated to the point that he is at serious risk of imminent and unnecessary institutionalization— a result that is made more complicated by D.D.'s need for constant medical attention because he has a pacemaker. The techniques used in institutional placement are even less appropriate for him than other children because of his heart condition.

**E.E. (Pointe Coupee Parish)**

16. Plaintiff, E.E. is a 12-year-old Medicaid recipient residing in Pointe Coupee Parish, Louisiana, who has been diagnosed with multiple mental illnesses and conditions. He brings this action by and through his mother, P.E. Due to Defendants' failure to ensure the provision of IHCBS, E.E. has repeatedly cycled in and out of hospitals and psychiatric institutions that are located hundreds of miles away from his family, and he has become juvenile-justice involved. Because of Defendants' failures, E.E. is at serious risk of being unnecessarily institutionalized.

*Defendants*

17. Defendant Dr. Rebekah Gee is the Secretary of the LDH, and as such, is responsible for the "administration, control, and operation of the functions, programs, and affairs" of LDH and ensuring that LDH complies with federal laws and regulations. La. Rev. Stat. Ann. § 36:253, § 36.254. Defendant Gee is sued in her official capacity only.

18. Defendant LDH is the single state agency responsible for administering Louisiana's Medicaid program. La. Rev. Stat. Ann. § 36:251.

## IV.    CLASS ALLEGATIONS

19. Plaintiffs bring this statewide class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(2) on behalf of:

> All Medicaid-eligible youth under the age of 21 in the State of Louisiana who are diagnosed with a mental illness or condition, not attributable to an intellectual or developmental disability, and who are eligible for, but not receiving, intensive home and community based (mental health) services with sufficient frequency, intensity, and duration they need to remain in their homes and home communities.

20. The Class is composed of approximately 47,500 youth under 21 throughout Louisiana who have a psychiatric illness, including children with severe emotional disturbances. The Class is of limited financial means as Medicaid-eligible persons. The Class also includes future members— Louisiana Medicaid-eligible children and youth who will require IHCBS to address their mental health needs.

21. Common questions among Plaintiffs and the Class include: (a) whether Defendants are providing necessary and timely IHCBS to Plaintiffs and the Class consistent with the EPSDT and Reasonable Promptness requirements of the Medicaid Act; (b) whether Defendants are failing to provide Plaintiffs and the Class with services in the most integrated setting appropriate to their needs, thereby resulting in unnecessary

institutionalization or serious risk of institutionalization of Plaintiffs and the Class; (c) and whether Defendants utilize criteria or methods of administration in their Medicaid program that otherwise have the effect of discriminating against Plaintiffs and members of the Class on the basis of their disabilities.

22. The claims and remedies asserted by Plaintiffs are typical of the claims and remedies asserted by the Class. Plaintiffs and the Class are all Medicaid-eligible youth under the age of 21, with mental illnesses or conditions, who require IHCBS in order to correct or ameliorate a mental illness or condition. The remedies sought by Plaintiffs are the same remedies that would benefit the Class: an injunction requiring Defendants to take affirmative actions to provide or arrange for necessary IHCBS for all individual Plaintiffs and the Class in order to correct or ameliorate their significant mental health conditions.

23. Plaintiffs and their parents are adequate representatives of the Class. They share the interests of the Class in advocating for IHCBS, as required by the Medicaid Act. Like the Class, they also seek to avoid the serious risk of being unnecessarily institutionalized in violation of Title II of the ADA and Section 504. Finally, Plaintiffs' families have experienced the same challenges as class members in navigating the Medicaid system as it relates to their children.

24. Counsel for Plaintiffs, Southern Poverty Law Center (SPLC), the National Health Law Program (NHeLP), the National Center for Law and Economic Justice (NCLEJ), Advocacy Center, and O'Melveny & Meyers, LLP (OMM) are adequate counsel for class representatives. Each has extensive experience litigating complex, federal class-action lawsuits under Rule 23(b)(2). SPLC has led a multi-year investigation into the systemic and widespread deficiencies of the Louisiana children's mental health system. SPLC,

8

NCLEJ, NHELP, and the Advocacy Center have extensive experience litigating Rule 23(b)(2) class actions under the Medicaid Act, the ADA, and Section 504.

25. Plaintiffs and the Class further meet Rule 23(b)(2) requirements. First, Plaintiffs and the Class have suffered the same injury: all have been deprived of necessary and timely IHCBS in violation of the Medicaid Act. Due to this failure, they are also at serious risk of unnecessary institutionalization in violation of the ADA and Section 504. Second, neither Plaintiffs nor the Class seek monetary relief; and thus, the question of predominance is inapplicable. Finally, the injunctive relief sought by Plaintiffs and the Class is sufficiently specific and can be achieved with a single order requiring Defendants to provide necessary IHCBS.

## V.    STATUTORY AND REGULATORY FRAMEWORK FOR DEFENDANTS

### A.  The Federal Medicaid Act and EPSDT Mandate

26. Medicaid is a cooperative federal and state-funded program authorized and regulated pursuant to the Medicaid Act, which provides medical assistance for certain groups of low-income persons. *See* 42 U.S.C. § 1396, *et seq.*

27. Medicaid's central purpose is to furnish medical assistance, rehabilitation, and other services to help low-income families and individuals attain or retain capability for independence or self-care. *See* 42 U.S.C. § 1396-1.

28. State participation in Medicaid is voluntary; however, states that choose to receive federal funding for a significant portion of the cost of providing Medicaid benefits and administering the program must adhere to the minimum federal requirements set forth in the Medicaid Act, as amended, and its implementing regulations.

29. States participating in the Medicaid program must designate a single state agency that has the non-delegable duty to administer or supervise the administration of the Medicaid program and to ensure that the program complies with all relevant laws and regulations. *See* 42 U.S.C. § 1396a(a)(5); 42 C.F.R. § 431.10.

30. Federal law requires states participating in Medicaid to operate their Medicaid programs pursuant to state Medicaid plans that have been approved by the Secretary of the U.S. Department of Health and Human Services.

31. States must cover certain mandatory services in their state Medicaid plans. 42 U.S.C. §1396a(a)(10)(A), 1396d(a)(1)-(5), (17), (21), and (28)-(29). Mandatory services include EPSDT for children under age 21. 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43), 1396d(a)(4)(B), 1396d(r).

32. EPSDT requires that the services that are coverable under 42 U.S.C. §1396d(a) must be provided if they are "necessary health care, diagnostic services, treatment, and other measures . . . to correct or ameliorate defects and physical and mental illnesses and conditions . . . regardless of whether or not such services are covered" for adults. 42 U.S.C. § 1396d(r)(5). Services must be covered if they correct, compensate for, improve a condition, or prevent a condition from worsening, even if the condition cannot be prevented or cured. *EPSDT: A Guide for States: Coverage in the Medicaid Benefit for Children and Adolescents*, U.S. Dep't of Health & Human Servs., Ctrs., (June 2014), https://www.medicaid.gov/medicaid/benefits/downloads/epsdt_coverage_guide.pdf (last viewed Nov. 6, 2019 at 10. (EPSDT: A Guide). Specifically, states participating in the Federal Medicaid Program must establish and implement an EPSDT program in their state Medicaid plan that:

a.  informs all persons in the state who are under the age of 21 and eligible for medical assistance of the availability of EPSDT as described in 42 U.S.C. § 1396d(r);

b.  provides or arranges for the provision of such screening services in all cases where they are requested (42 U.S.C. § 1396a(a)(43)); and

c.  provides or arranges for corrective treatment, the need for which is disclosed by such child health screening services. *Id.*

33. Rehabilitative services (*Id.* at § 1396d(a)(13)) and case management services (*Id.* at § 1396d(a)(19), 1396n(g)) are among the services listed in 42 U.S.C. § 1396d(a) that are encompassed within IHCBS and covered by Medicaid. These services must be provided by the state under the EPSDT mandate.

34. The Medicaid Act requires states to provide covered services (or "make medical assistance available"), including mental health services provided pursuant to the EPSDT mandate, to Medicaid beneficiaries when medically necessary, with "reasonable promptness to all eligible individuals." 42 U.S.C. § 1396a(a)(8). "The term 'medical assistance' means payment of part or all of the cost of the . . . care and services or the care and services themselves, or both." 42 U.S.C. § 1396d(a).

35. Additionally, states "must set standards for the timely provision of EPSDT services which meet reasonable standards of medical and dental practice . . . and must employ processes to ensure timely initiation of treatment, if required, generally within an outer limit of six months after the request for screening services." 42 C.F.R. § 441.56(e).

36. States must "make available a wide variety of individual and group providers qualified and willing to provide EPSDT services." 42 C.F.R. § 441.61(b).

37. Even when a particular service or treatment for youth is not included in a state plan, a state must nevertheless provide that service or treatment if it is listed in Section 1396d(a) and necessary to correct or ameliorate the child's condition. 42 U.S.C. § 1396a(a)(43)(C); 42 C.F.R. § 441.57.

**B. The Americans With Disabilities Act and Section 504 of the Rehabilitation Act of 1973**

38. Congress enacted the ADA in 1990 "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1). The ADA acknowledges that "historically, society has tended to isolate and segregate individuals with disabilities, and despite some improvements, such forms of discrimination against individuals with disabilities continue to be a serious and pervasive social problem." *Id*. § 12101(a)(2).

39. In enacting the ADA, Congress found that "[i]ndividuals with disabilities continually encounter various forms of discrimination, including . . . segregation. . . ." *Id*. § 12101(a)(5).

40. Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity." *Id*. § 12132.

41. Plaintiffs and the Class are "qualified individuals with a disability," meaning they are each an "individual with a disability, who with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility

requirements for the receipt of services or the participation in programs or activities provided by a public entity." *Id*. § 12131.

42. Defendant Gee administers LDH, which is a "public entity" subject to the nondiscrimination requirements of Title II of the ADA. *Id*. § 12131.

43. Regulations implementing the requirements of Title II of the ADA provide that "[a] public entity shall administer services, programs, and activities in the most integrated setting appropriate to the needs of qualified individuals with disabilities." 28 C.F.R. § 35.130(d). The most integrated setting appropriate to the needs of a qualified individual with a disability means "a setting that enables individuals with disabilities to interact with nondisabled persons to the fullest extent possible." 28 C.F.R. pt. 35, App. B. 59.

44. The ADA's implementing regulations further prohibit public entities from utilizing "criteria or methods of administration" that have the effect of subjecting qualified individuals with disabilities to discrimination or "[t]hat have the purpose or effect of defeating or substantially impairing accomplishment of the objectives of the entity's program with respect to individuals with disabilities . . . ." *Id*. § 35.130(b)(3). The regulations also provide that, "A public entity shall not impose or apply eligibility criteria that screen out or tend to screen out an individual with a disability or any class of individuals with disabilities from fully and equally enjoying any service, program, or activity, unless such criteria can be shown to be necessary for the provision of the service, program, or activity being offered." *Id*. § 35.130(b)(8).

45. The implementing regulations of Title II of the ADA require public entities to "make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability unless the public entity can

demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." *Id*. § 35.130(b)(7).

46. The United States Supreme Court has held Title II of the ADA prohibits the unjustified segregation of individuals with disabilities. *Olmstead v. L.C. ex rel. Zimring*, 527 U.S. 581, 600 (1999). The Court explained that its holding "reflects two evident judgments." *Id*. "First, institutional placement of persons who can handle and benefit from community settings perpetuates unwarranted assumptions that persons so isolated are incapable or unworthy of participating in community life." *Id*. "Second, confinement in an institution severely diminishes the everyday life activities of individuals, including family relations, social contacts, work options, economic independence, educational advancement, and cultural enrichment." *Id*. at 601.

47. Similar to the ADA, Section 504 states that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C. § 794(a).

48. Under Section 504, "program or activity" means "all of the operations of a department, agency, special purpose district, or other instrumentality of a State or of a local government." *Id*. § 794 (b)(1).

49. Section 504 defines an "individual with a disability" as "any person who has a disability as defined in…the Americans with Disabilities Act." *Id*. § 705(20)(B).

50. Implementing regulations of Section 504 provide that programs or activities that receive federal funding may not deny or otherwise "afford a qualified [individual with a disability] an opportunity to participate in or benefit from the aid, benefit, or service" that is not

"equal to" or "as effective as that afforded [or provided] to others." 45 C.F.R. § 84.4 (b)(1)(i)-(iii); *see also* 28 C.F.R. § 41.51 (DOJ regulations describing prohibitions on disability-based discrimination).

51. The implementing regulations of Section 504 further provide that such programs must "afford [individuals with disabilities] equal opportunity to obtain the same result, to gain the same benefit, or to reach the same level of achievement, in the most integrated setting appropriate to the person's needs." 45 C.F.R. § 84.4 (b)(2); *see also* 28 C.F.R. § 41.51(d) ("Recipients [of federal financial assistance] shall administer programs and activities in the most integrated setting appropriate to the needs of [qualified individuals with disabilities].")

52. Because they share a similar framework, Title II of the ADA and Section 504 generally "are interpreted *in pari materia*." *Frame v. City of Arlington*, 657 F.3d 215, 223 (5th Cir. 2011).

**C. Public Behavioral Health Services for Children and Youth in Louisiana**

53. Louisiana has elected to participate in the Medicaid program and receives federal matching funding that is currently set at 65 percent. *Federal Matching Shares for Medicaid and CHIP for Oct. 1, 2018 through Sept. 30, 2019*, 82 Fed. Reg. 55383, 55385 (2019).

54. As required of all states participating in Medicaid, Louisiana has prepared a state plan for medical assistance (State Plan). *See Louisiana Medicaid Program, State Plan, Chapter 3, Section 3.1-A*, http://ldh.la.gov/assets/medicaid/StatePlan/Sec3/Attachment3.1AItem4b.pdf (last accessed Nov. 4, 2019) (State Plan).

55. LDH is the single state agency responsible for administering Louisiana's Medicaid program. La. Rev. Stat. Ann. § 36:251.

56. As of the date of this filing, LDH contracts with five Managed Care Organizations (MCOs) to deliver physical health and mental health services to all Medicaid-eligible beneficiaries, including children and youth. *See Provider and Plan Resources*, Louisiana Department of Health, http://ldh.la.gov/index.cfm/page/1065 (last accessed Nov. 4, 2019).

57. Even though LDH contracts with MCOs to deliver services, LDH remains solely and ultimately responsible for ensuring the fulfillment of all relevant Medicaid requirements, including the mandates of the EPSDT program. 42 U.S.C. § 1396a(a)(5), 42 U.S.C. § 1396u-2; 42 U.S.C § 1396a(a)(43).

## VI.    DEFENDANTS' UNLAWFUL POLICIES, PRACTICES, AND PROCEDURES

### A. Defendants' failure to fulfill their Federal mandate to implement an accessible, statewide system of IHCBS

58. In 2018, the Legislative Auditor determined that Defendants have failed to implement an accessible system of IHCBS throughout the state. *February 2018 LDH Audit*, at 5, 7. Contributing to Defendants' failure to provide an accessible system of IHCBS is Defendants' failure to ensure coverage of all necessary EPSDT services in their State Plan. The Defendants also acknowledge that their implementation of a public behavioral health system is entirely undermined by, *inter alia*, a "shortage of licensed providers throughout the state." *FY2018-19 Combined Behavioral Health Block Grant Plan*, Louisiana Department of Health, (Sept. 1, 2017), http://ldh.la.gov/assets/csoc/block_grant/FY1819_Block_Grant_Plan_approved_update.pd f at 15 (last viewed November 6, 2019).

16

59. Yet another critical barrier to the accessibility of public behavioral health services, including IHCBS, as acknowledged by Defendants in their most recent application for federal block grant funding, is the lack of "education on how to navigate behavioral health system and get services." *FY2020 Combined Behavioral Health Block Grant Plan*, Louisiana Department of Health (Sept. 1, 2019), http://ldh.la.gov/assets/csoc/block_grant/FINAL_BG.pdf at 15. Families of children and youth Medicaid beneficiaries who have been diagnosed with a mental illness or condition have difficulty accessing what mental health services there are, in part, because they are unaware that such services exist.

60. Defendants' failure to provide IHCBS, including intensive care coordination, crisis services, and intensive behavioral services and supports, has resulted in tens of thousands of Louisiana children and youth with behavioral and emotional disorders, including Plaintiffs and the Class, to languish or deteriorate in their communities to the point of being at serious risk of unnecessary institutionalization in psychiatric facilities away from their families.

**Intensive care coordination**

61. Intensive care coordination is a robust form of case management that includes: an assessment and service planning process conducted through a team, assistance accessing and arranging for services, coordinating multiple services, including crisis services, monitoring and follow-up activities, and transition planning.

62. For youth receiving intensive care coordination, a designated care coordinator must work in partnership with the family, conducting a comprehensive home-based assessment and identifying and coordinating a single treatment team (a "child and family team, or "CFT").

The CFT will develop an integrated plan of care which describes the youth's and family's vision, identifies their strengths and needs, and articulates their service goals and preferences. This plan informs and guides the delivery of care in the community across providers and service settings. The CFT can include educational service providers, a collaboration which creates opportunities to coordinate Individual Education Plan (IEP) goals with community treatment planning efforts, and to consult regarding ongoing behavioral health needs.

63. Intensive care coordination is a coverable case management service and rehabilitation service under the Medicaid Act. *See* 42 U.S.C. §§ 1396d(a)(19); 1396n(g)(2); 42 C.F.R. § 440.169(d) (describing the components of case management); 42 U.S.C. §§ 1396d(a)(13); 42 C.F.R. § 440.130(d).

64. Intensive care coordination is necessary to correct or ameliorate the mental health conditions of Plaintiffs and the Class. However, Defendants have failed to ensure that intensive care coordination is covered as a service, as required under Medicaid's EPSDT mandate, and have failed to provide the service or  to ensure that the MCOs they contract with to fulfill their EPSDT mandate provide intensive care coordination throughout the state to Louisiana Medicaid beneficiaries who are children and youth with mental illnesses or conditions.

65. The State Plan includes treatment planning as a component of a Medicaid covered rehabilitative service referred to as "community psychiatric support and treatment" or CPST. *See State Plan Chapter 3, Section 3.1-A*, Item 4.b, at 9a. According to the State Plan, treatment planning "includes an agreement with the individual and family members (or other collateral contacts) on the specific strengths and needs, resources, natural

18

supports, and individual goals and objectives for that person." *Id.* Treatment planning "should also include developing a crisis management plan." *Id.* However, treatment planning, as defined in the State Plan, does not constitute intensive care coordination and is not sufficient to meet the needs of Plaintiffs and the Class. Furthermore, Defendants do not cover necessary intensive care coordination as a separate EPSDT service.

66. To the extent Defendants may argue that intensive care coordination services can be made available through case management provided by the MCOs, the Legislative Auditor concluded otherwise, when it observed that 0.8% of all Medicaid recipients with a behavioral health diagnosis received case management services from the MCOs. *February 2018 LDH Audit*, at 7. Ostensibly, because this figure includes both adults and children, it is safe to assume that a negligible number of Medicaid children with a behavioral health diagnosis receive any case management services.

67. As a result of the Defendants' failure to cover or provide intensive care coordination to Plaintiffs and the Class, these children and youth continue to receive inadequate and uncoordinated services through the existing fragmented mental health system, including receiving inconsistent and at times conflicting diagnoses and medication. As observed by the Legislative Auditor, "we saw examples in the Medicaid data where individuals received a variety of services across the state, including emergency rooms and psychiatric hospitals, and received differing behavioral health diagnoses." *February 2018 LDH Audit*, at 17.

68. Additionally, Plaintiffs and the Class, as a result of Defendants' failure to cover or provide intensive care coordination, are often forced to rely on personnel in other systems (e.g., schools and juvenile-justice) who lack a clinical understanding of the child's mental health

needs, but might be available to assist them with attempting to access mental health services.

69. Further, in the absence of intensive care coordination, the parents of Plaintiffs and members of the Class, who may have other children to rear, income challenges, or their own health issues, are forced to attempt to navigate the state's complex behavioral health system with little to no support from Medicaid authorities.

**Crisis services**

70. Per the Louisiana State Plan, crisis services consist of crisis intervention (or mobile crisis) and crisis stabilization services. *See State Plan, Chapter 3, Section 3.1-A*, *Item 4.b*, at 9d(1).

71. According to the State Plan, Defendants define crisis intervention as follows: "Crisis intervention is provided to [sic] children and youth who are experiencing a psychiatric crisis, designed to interrupt and/or ameliorate a crisis experience including a preliminary assessment, immediate crisis resolution and de-escalation, and referral to appropriate community services to avoid more restrictive levels of treatment." *Id.* "Crisis intervention is a face-to-face intervention" that is to be provided "where the child or youth lives, works, attends school, and/or socializes." *Id.*

72. According to the State Plan, Defendants define crisis stabilization as follows: "Crisis stabilization services are short-term and intensive supportive resources for children and youth and their family." *Id.* "The intent of this service is to provide an out-of-home crisis stabilization option for the family in order to avoid psychiatric inpatient and institutional treatment of children and youth by responding to potential crisis situations." *Id.* "During the time the crisis stabilization is supporting the child or youth, there is regular contact

with the family to prepare for the child's/youth's return and his/her ongoing needs as part

of the family." *Id.* at 9d(2). Crisis stabilization services are a coverable service that must

be provided in crisis receiving centers licensed by Defendants. *Id.*

73. Crisis services are necessary to address the mental health needs of Plaintiffs and the Class;

however, crisis intervention has not been provided to Plaintiffs and the Class and is not

available in many areas of the state for children and youth. Additionally, crisis

stabilization services are virtually non-existent throughout the state, as the Legislative

Auditor found that "Louisiana does not have any crisis receiving centers." *February 2018*

*LDH Audit* at 10.

74. As recognized by the Legislative Auditor, crisis services "can help interrupt or mitigate a

crisis and help prevent unnecessary emergency room visits and commitments." *Id.*

However, with inadequate or non-existent statewide crisis intervention services, including

mobile crisis services, and without crisis stabilization services in the state, Plaintiffs and

the Class are forced to seek and receive services during a crisis at either a psychiatric

hospital or an emergency room and subsequently end up forced to receive services in an

institutional psychiatric facility far away from their home, family, community, and school.

**Intensive behavioral services and supports**

75. Intensive behavioral services and supports are coverable rehabilitation services. *See* 42

U.S.C. § 1396d(a)(13).

76. According to Defendants' State Plan, intensive behavioral services and supports include:

> (1) therapeutic interventions, including ongoing professionally-
> adequate assessments of current risk and presenting problems,
> medication management, face-to-face individual, family, and
> group therapy by a qualified provider, and psychological testing;
> (2) face-to-face individualized supportive interventions associated
> with assisting individuals with skill restoration to restore stability,

21

> support functional gains and adapt to community living, including problem-solving, emotional and behavioral management, and social, interpersonal, self-care, and independent living skills; (3) and face-to-face psycho-educational services to improve self-management of the negative effects of psychiatric or emotional symptoms that interfere with a person's daily living.

*See State Plan, Chapter 3, Section 3.1-A* at 9-9(d).

77. Intensive behavioral services and supports should be accessible at any time and in any setting where a child is located. However, Defendants have failed to ensure the provision of intensive behavioral services and supports throughout the state, despite the necessity of these services for Plaintiffs and the Class. These services are either not provided at all, or not provided with the level of intensity, frequency, and duration sufficient to constitute intensive behavioral services that are necessary to address the mental health needs of Plaintiffs and the Class.

78. Defendants have further failed to ensure the provision of intensive behavioral services and supports by altogether not covering peer support services in their State Plan. Intensive behavioral services and supports should also include peer support specialists who work with the child in their natural setting, as trained mentors to support, coach, and train the child in age-appropriate behaviors, interpersonal communications, problem-solving skills, and conflict resolution. According to the Substance Abuse and Mental Services Administration (SAMHSA) of the U.S. Department of Health & Human Services, peer support services have been found to increase social support and social functioning, decrease psychotic symptoms, and reduce hospitalization rates. *Value of Peers, 2017*, Substance Abuse and Mental Health Services Administration, https://www.samhsa.gov/sites/default/files/programs_campaigns/brss_tacs/value-of-peers-2017.pdf (last viewed Nov. 6, 2019) at 13. Defendants' failure to make peer support

services a separate and coverable EPSDT service under the State Plan, has rendered

necessary peer support services largely inaccessible and unavailable to Plaintiffs and the

Class throughout the state.

79. A survey conducted by the Legislative Auditor and issued to 101 hospitals with

emergency departments across the state, garnering a total of 36 responses, revealed that

"85% of the respondents stated that there are not adequate community-based services, and

76% of the respondents do not believe that appropriate follow-up treatment and care

services are available once they release patients." *February 2018 LDH Audit,* at 3, 9. The

Legislative Auditor further determined that in the absence of community-based services,

including IHCBS, Medicaid recipients (including Plaintiffs and the Class) continue to rely

on emergency rooms to treat their mental health needs. *Id.* at 8. However, "according to

staff interviewed from hospitals with emergency room departments, [emergency rooms]

are not the appropriate place for individuals to be treated for most mental illnesses, as they

are not designed to provide the level of unique care needed by an individual with

behavioral health needs." *Id.* Medicaid beneficiaries, including Plaintiff and the Class, are

instead forced to seek mental health treatment in clinically-inappropriate settings and

denied services that are necessary and sufficiently intensive to meet their needs.

**B. The Plaintiffs' Experience With Louisiana's Public Behavioral Health System**

80. Plaintiffs, A.A., B.B., C.C., D.D., and E.E., are child Medicaid recipients residing across

Louisiana who have been diagnosed with a mental illness or condition. Each Plaintiff, as

well as the members of the Class, share a common and vital thread: all have experienced

harm resulting from Defendants' failure to ensure the provision of necessary IHCBS.

81. A.A., C.C., and E.E. have unnecessarily cycled in and out of hospitals, emergency rooms, and psychiatric institutions located hundreds of miles away from their families—a form of trauma by itself for the children and their families, and costly for Louisiana's taxpayers—and for B.B. and D.D., the risk of institutionalization is imminent. A.A., C.C., and E.E. have all become juvenile-justice involved as a result of their mental health needs not being adequately addressed, and B.B.'s and D.D.'s mothers fear that they too will soon unnecessarily encounter the juvenile-justice system.

**A.A.** (**East Baton Rouge Parish**)

82. A.A. is an 11-year-old Medicaid recipient who lives in Baton Rouge. A.A. loves computers, video games, and aspires to attend college and become an FBI agent. A.A. desperately wants to be liked and to have friends. He currently lives with his mother, a younger brother who has mental health conditions, an older sister, and their cats.

83. A.A. has four different mental health diagnoses. A.A.'s providers first documented his behavioral symptoms in 2012 when he was four years old and they continue to date. During moments of crises, A.A. exhibits outbursts, anger, and engages in fighting. He expresses suicidal ideations, attention-seeking behaviors, and defiance. In light of his behaviors, A.A.'s providers determined that A.A. needs weekly individual, family, or group counseling; monthly medication management; psychiatric reassessments, as needed; care coordination; and IHCBS, including crisis services.

84. Despite these recommendations and A.A. consistently displaying these behavioral symptoms, A.A. has not had access to crisis services and other IHCBS needed to address his mental health conditions. A.A. does not have access to intensive care coordination to

develop and implement his treatment plan. Instead, A.A. and his family are left to navigate the state's complex public behavioral health system alone.

85. Unable to access the IHCBS necessary to address his mental health needs, A.A. has been admitted under physician orders to psychiatric institutions six times over the last three years— in institutions as near as 80 miles from his home, but as far as 240 miles from his home. On average, A.A. spends eight to ten days at these institutions before he is discharged.

86. A.A.'s institutionalizations follow a cyclical pattern: in the absence of IHCBS, including crisis services, A.A.'s mother reluctantly takes her son to the nearest emergency room, where he is then referred by a physician for treatment at psychiatric institutions located hundreds of miles away from home. Upon being discharged, the psychiatric institution provides A.A.'s mother with a discharge plan, advising A.A.'s mother to call 911, a 1-800 suicide hotline, or the psychiatric facility itself if he experiences another psychiatric episode. Despite his mother's requests to his providers for IHCBS, A.A. returns home where he receives basic, inadequate behavioral interventions consisting of the same infrequent counseling sessions and occasional medication management he was receiving prior to his institutionalization. Resultantly, A.A. becomes re-institutionalized.

87. Lacking access to the necessary IHCBS to address his mental health needs, A.A.'s condition continues to deteriorate. At home, his relationship with his mother, siblings, and peers is strained. He has been suspended, expelled, sent to an alternative school, and brought home by the police multiple times.

88. Not wanting A.A. to be re-institutionalized and fearful of the juvenile-justice system, A.A.'s mother continues to advocate for the mental health services and support he needs

as best as she can; however, advocating alone has taken a significant toll on her, A.A., and his siblings.

**B.B. (Caddo Parish)**

89. B.B. is a 13-year-old Medicaid recipient who lives in Shreveport. B.B. is enrolled in her school's gifted program. Her mother and teachers describe her as an overall pleasant young person. B.B. lives with her mother, stepfather, and her younger twin brothers.

90. B.B. has three different mental health diagnoses, as well as type 2 diabetes. When B.B. was four years old, she began to exhibit aggression, inattentiveness, anxiousness, suspiciousness, and bouts of depression. These behavioral symptoms continue to date.

91.  Despite consistently displaying these behavioral symptoms, and despite her mother's request for IHCBS, B.B. has never received IHCBS. In the moments when B.B. experiences a psychiatric crisis, B.B.'s mother must manage the crisis alone, implementing de-escalation procedures that she has researched on her own so that she does not have to call the police on B.B. or have her daughter unnecessarily institutionalized.

92. B.B. has never received intensive care coordination. Instead, B.B.'s mother has to research available and accessible Medicaid services, locate providers, and keep these providers abreast of any changes in B.B.'s condition and treatment. B.B.'s mother has called providers in the area only to learn that they no longer accept Medicaid patients, or that there is a long waitlist to receive treatment from the provider. At most, B.B. has received outpatient counseling and medication management.

93. As B.B. continues through adolescence with her mental illnesses going untreated, her mother fears that B.B.'s academic prowess will be subsumed by her behavioral symptoms,

that her relationship with her daughter will deteriorate to the point of no return, and that

unnecessary institutionalization is imminent.

**C.C. (Terrebonne Parish)**

94. C.C. is a 13-year-old Medicaid recipient who lives in Houma. C.C. has been an honor

student and has an interest in suspense and mystery novels. She lives with her adopted

parents, along with their two cats and two dogs.

95. C.C. has eight different mental health diagnoses. C.C.'s behavioral symptoms include

violent outbursts, damaging property, and running away from her home.

96. Despite consistently displaying these behavioral symptoms for years, and despite being

recommended for IHCBS, C.C. has never received crisis services and other IHCBS

necessary to address her mental health conditions.

97. Unable to access IHCBS, C.C. has been admitted under physician orders to psychiatric

institutions three times since becoming a Louisiana Medicaid recipient in 2016. These

facilities have been as far away as 300 miles from her family, and her most recent

institutionalization in late 2018 lasted for over 100 days. Between each

institutionalization, C.C. only receives outpatient counseling and medication management.

98. Lacking access to the necessary IHCBS to address her mental health needs, C.C.'s

condition continues to deteriorate. At home, her relationship with her mother, father, and

adult siblings is strained. C.C. is also juvenile-justice involved, having spent six different

overnight stays at the Terrebonne Parish Juvenile Detention Center, after violating the

terms of her probation under the Families in Need of Services (FINS) program, a

delinquency prevention program administered by the Louisiana Supreme Court.

99. Not wanting C.C. to be re-institutionalized, C.C.'s family is desperate for her to receive the IHCBS needed to remain at home and function at home and in her community.

**D.D.** **(Rapides Parish)**

100. D.D. is a 13-year-old Medicaid recipient who lives in Alexandria. His mother and teachers describe D.D. as very inquisitive, and he enjoys drawing and playing video games. D.D. lives with his mother and multiple pets.

101. D.D. has four different mental health diagnoses as well as a congenital heart condition that required the implantation of a pacemaker at birth. Since moving to Louisiana in 2015, D.D.'s mental health conditions have become very pronounced. He has repeatedly played with fire; expressed homicidal and suicidal ideations; engaged in self-harming behaviors; and made threats to himself, teachers, and peers.

102. Despite consistently displaying these behavioral symptoms, D.D. has not had access to crisis services and other IHCBS needed to address his mental health conditions.

103. D.D.'s mother first sought mental health services from Defendants in February 2017, when D.D. expressed suicidal ideations. Because Defendants do not provide necessary crisis intervention services or other IHCBS to meet her son's needs at home or in the community, D.D.'s mother had no choice but to take him to the nearest emergency room for psychiatric treatment.

104. While at the emergency room, a nurse in the emergency room attempted to have D.D. placed in an institution under physician's orders. However, the hospital called every psychiatric facility in the state, and all responded that they would not accept a child with a pacemaker due to liability concerns. As a result, D.D. was discharged from the emergency room after a three-day stay with no follow-up services.

105. Despite this hospitalization and the behavioral symptoms displayed by D.D. that led to his hospitalization, D.D. was not provided necessary crisis services and other IHBCS. In the spring of 2018, D.D. was expelled from school. At the time of his expulsion, D.D. was repeating the 5th grade due to behavioral concerns stemming from his unaddressed mental health needs.

106. Currently, D.D. only receives medication management and outpatient counseling. In the absence of necessary IHBCS, D.D.'s own family acts as crisis managers. With no access to needed crisis services, D.D.'s crisis plan instructs that at the moment he experiences another psychiatric crisis, he is to contact his sister, who lives in Florida; or his grandmother; his outpatient therapist; or 911.

107. D.D.'s mother is fearful that if D.D. again reaches the point of crisis, she will have no choice but to have him unnecessarily institutionalized to a psychiatric facility that is potentially hundreds of miles away from his home. At the same time, she worries that the facility will not be properly equipped and knowledgeable in caring for a child with both behavioral health and cardiac needs.

**E.E. (Pointe Coupee Parish)**

108. E.E. is a 12-year-old Medicaid recipient who lives in Morganza. E.E. enjoys painting, drawing, reading, and sports. He hopes to travel the world one day. E.E. lives with his mother, stepfather, and siblings.

109. E.E. has four different mental health diagnoses. His behavioral symptoms were first noticed when he entered kindergarten and became physically aggressive and displayed threatening behaviors towards his family, teachers, and peers, and himself. These behaviors continue to date.

29

110. Despite consistently displaying these behavioral symptoms and despite being recommended for IHCBS, E.E. has not had access to crisis services and other IHCBS needed to address his mental health conditions. E.E.'s mother has had to attempt to navigate the state's complex public behavioral health system alone, despite having her own health needs to address.

111. Defendants have failed to provide intensive care coordination necessary to plan and coordinate E.E.'s treatment. For example, E.E.'s providers have repeatedly changed his diagnoses and prescribed medications without consulting one another. This has resulted in conflicting and inconsistent treatment. E.E. has been prescribed a cocktail of psychotropic medications by psychiatrists— a dangerous combination for a child diagnosed with a fatty liver and diabetes.

112. Unable to access the IHCBS necessary to address his mental health needs, E.E. has been admitted under physician orders to a psychiatric institution seven times over the last six years, in institutions as far as 200 miles away from his home. In each instance, E.E. was transported to a hospital emergency room by his family or the police. On average, E.E. spends eight to ten days at these institutions before he is discharged.

113. Upon discharge, and with there being no access to crisis services, E.E.'s mother received a discharge plan from the psychiatric institution advising her to call 911, a 1-800 suicide hotline, or the psychiatric institution itself should E.E. experience another psychiatric crisis.

114. Between each institutionalization, despite requests made by his mother to providers to obtain needed IHCBS, E.E. does not receive such services. Instead, he receives the same

basic interventions of inconsistent counseling sessions, and occasional medication and case management.

115. Lacking access to the necessary IHCBS to address his mental health needs, E.E.'s condition continues to deteriorate. E.E. has repeatedly been suspended and expelled from school. E.E. has also been arrested as a result of his outbursts and behaviors and has become juvenile-justice involved. Further, due to the manifestations of his behavioral symptoms at home, his relationships with his mother and siblings have been severely strained. In the absence of IHCBS, yet another stay at a psychiatric institution for E.E. is imminent.

## VII.  LEGAL CLAIMS

### COUNT I
### Defendant Gee's Violation of the EPSDT Provisions of the Medicaid Act

116. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

117. Defendant Gee has failed to provide or otherwise arrange for Plaintiffs and the Class to receive the required Early and Periodic Screening, Diagnostic and Treatment services that are needed to adequately assess and address their mental illness or conditions, in violation of 42 U.S.C. §§ 1396a(a)(10)(A), 1396a(a)(43)(B), 1396d(a)(4)(B), and 1396d(r)(1)(A).

118. Defendant Gee has failed to arrange for the provisions of IHCBS that are necessary to correct or ameliorate the mental illnesses or conditions of Plaintiffs and the Class throughout the state, in violation of 42 U.S.C. §§ 1396a(a)(10(A), 1396a(a)(43)(C), and 1396d(r)(5).

119. Defendant Gee's actions and omissions described above deprive Plaintiffs and the Class of their statutory rights under the EPSDT mandate to receive necessary screening,

diagnostic, and treatment (IHCBS). Plaintiffs and the Class are therefore entitled to relief under 42 U.S.C. § 1983.

## COUNT II
### Defendant Gee's Violation of the Reasonable Promptness Provisions of the Medicaid Act

120. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

121. Defendant Gee has engaged in the continuous and ongoing failure to ensure the provision of medically necessary IHCBS with "reasonable promptness" in violation of 42 U.S.C. § 1396a(a)(8).

122. Defendant Gee's actions and omissions described above violate the Medicaid Act by depriving Plaintiffs and the Class of their right to receive IHCBS with reasonable promptness, thereby entitling Plaintiffs and the Class to relief under 42 U.S.C. § 1983.

## COUNT III
### Defendant Gee's Violation of Title II of the Americans With Disabilities Act

123. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

124. Defendant Gee administers the Louisiana Department of Health, a "public entity" under Title II of the ADA. 42 U.S.C. § 12131(1).

125. Plaintiffs and the Class are qualified persons with disabilities under Title II of the ADA, and they are qualified to participate in or receive LDH's programs, services, and activities, including necessary IHCBS under the Medicaid Act's EPSDT provisions. 42 U.S.C. §§ 12102, 12131(2).

126. Defendant Gee has violated Title II of the ADA by administering LDH's Medicaid services in a manner that fails to ensure Plaintiffs and the Class receive federally-

mandated IHCBS, in the most integrated setting appropriate to their needs (i.e., at home and in the community). These failures subject Plaintiffs and the Class to unnecessary institutionalization in hospitals and psychiatric facilities, or the serious risk thereof. 42 U.S.C. § 12132; 28 C.F.R. § 35.130(d).

127. Defendant Gee's actions constitute discrimination in violation of Title II of the ADA, 42 U.S.C. § 12132, and its implementing regulations at 28 C.F.R. Part 35, by failing to provide reasonable modifications to programs and services in order to provide or ensure the provision of necessary IHCBS, and to provide these services to qualified individuals, including Plaintiffs and the Class. 28 C.F.R. §35.130(b)(7).

128. Defendant Gee has utilized and adopted criteria and methods of administration that have the effect of subjecting Plaintiffs and the Class to unnecessary institutionalization or serious risk thereof, and therefore discrimination based on their disabilities, in failing to provide, or ensure the provision of IHCBS to qualified individuals, including Plaintiffs and the Class. 28 C.F.R. § 35.130(b)(3).

129. Plaintiffs and the Class are therefore entitled to declaratory and injunctive relief to remedy Defendant Gee's violations of Title II of the ADA.

## COUNT IV
## Defendants Gee and LDH's Violation of Section 504 of the Rehabilitation Act

130. Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as though fully set forth herein.

131. Defendant LDH is a recipient of federal funds and is, therefore, a "program or activity" under Section 504. 29 U.S.C. §794(b)(1).

132. Plaintiffs and the Class are qualified persons with disabilities covered by Title II of the ADA, and they are qualified to participate in or receive LDH's programs, services, and

activities, including necessary IHCBS, under the Medicaid Act's EPSDT provisions. 29

U.S.C. § 705(20) (defining an individual with a disability under Section 504 as "any

person who has a disability as defined in . . . the Americans with Disabilities Act"); *see*

*also* 42 U.S.C. §§ 12102, 12131(2).

133. Defendants Gee and LDH have violated Section 504 by administering LDH's Medicaid

services in a manner that fails to ensure that Plaintiffs and the Class receive federally-

mandated EPSDT services, including IHCBS, in the most integrated setting appropriate to

their needs (i.e., at home and in the community). These failures subject Plaintiffs and the

Class to unnecessary institutionalization in hospitals and psychiatric facilities, or serious

risk thereof. 29 U.S.C. § 794; 45 C.F.R. §§ 84.4 (b)(1)(i)-(iii), (b)(2); 28 C.F.R. §

41.51(d).

134. Defendants Gee and LDH's actions constitute discrimination in violation of Section 504

by failing to provide reasonable modifications to programs and services in order to ensure

the provision of IHCBS to qualified individuals, including Plaintiffs and the Class.

135. Defendants Gee and LDH have utilized and adopted criteria and methods of

administration that have the effect of subjecting Plaintiffs and the Class to unnecessary

institutionalization, or serious risk thereof, and therefore discrimination based on their

disabilities. 28 C.F.R. § 41.51(b)(3); 45 C.F.R. § 84.4.

136. Plaintiffs and the Class are therefore entitled to declaratory and injunctive relief to

remedy Defendants Gee and LDH's violations of Section 504.

## VIII.  PRAYER FOR RELIEF

137. WHEREFORE, Plaintiffs request that the Court order the following relief and remedies on behalf of themselves and others similarly situated:

a. Certify this case as a class action pursuant to Federal Rule of Civil Procedure 23(a) and Rule 23(b)(2);

b. Issue a declaratory judgment in favor of Plaintiffs and the Class that Defendants have failed to comply with the requirements of the EPSDT provisions and reasonable promptness provisions of the Medicaid Act, the Americans with Disabilities Act, and the Rehabilitation Act;

c. Grant permanent injunctive relief requiring the Defendants to:

    i. establish and implement policies, procedures, and practices to ensure the provision of intensive home and community-based mental health services to Plaintiffs and the Class;

    ii. establish and implement policies, procedures, and practices to ensure that Defendants do not discriminate against Plaintiffs and the Class; and that Defendants provide Plaintiffs and the Class the services for which they are eligible in the most integrated setting appropriate to their needs;

d. Retain jurisdiction over the Defendants until such time as the Court is satisfied that Defendants' unlawful policies, practices, and acts complained of herein will not reoccur;

e. Award Plaintiffs their costs and reasonable attorneys' fees pursuant to 42 U.S.C. § 1988 and other applicable laws or regulations incurred for prosecuting this case; and

f. Grant such other equitable relief as the Court deems just and proper.

Respectfully submitted this 7th day of November 2019,

A.A., B.B., C.C., D.D., and E.E.
By and through their parents

/s/ Victor M. Jones
Victor M. Jones, LA Bar No. 34937, T.A.
Sophia Mire Hill, LA Bar No. 36912
Neil S. Ranu, LA Bar No. 34873
**Southern Poverty Law Center**
201 St. Charles Avenue, Suite 2000
New Orleans, LA 70170
Phone: (504) 486-8982, ext. 1491
Facsimile: (504) 486-8947
victor.jones@splcenter.org
sophia.mire.hill@splcenter.org
neil.ranu@splcenter.org

    /s/ Kimberly Lewis
Kimberly Lewis, CA Bar No. 144879
Abigail Coursolle, CA Bar No. 266646
**National Health Law Program**
3701 Wilshire Boulevard, Suite 750
Los Angeles, CA 90010
Phone: (310) 204-6010
lewis@healthlaw.org
coursolle@healthlaw.org
*Pro hac vice pending*

    /s/ Travis W. England
Travis W. England, NY Bar No. 4805693
Britney R. Wilson, NY Bar No. 5426713
**National Center for Law and
Economic Justice**
275 Seventh Avenue, Suite 1506
New York, NY 10001-6860
Phone: (212) 633-6967
Facsimile: (212) 633-6371
england@nclej.org
wilson@nclej.org
*Pro hac vice pending*

    /s/ Debra J.  Weinberg
Debra J. Weinberg, LA Bar No. 32760

36

Ronald Lospennato, LA Bar No. 32191
**Advocacy Center**
8325 Oak Street
New Orleans, LA 70118
Phone: (504) 522-2337
Facsimile: (504) 522-5507
dweinberg@advocacyla.org
rlospennato@advocacyla.org


   /s/ Darin Snyder                      
Darin W. Snyder, CA Bar No. 136003
Kristin M. MacDonnell, CA Bar No. 307124
**O'Melveny & Myers LLP**
Two Embarcadero Center, 28th Floor
San Francisco, CA 94111
Phone: (415) 984-8700
Facsimile: (415) 984-8701
dsnyder@omm.com
kmacdonnell@omm.com
*Pro hac vice pending*

***Counsel for Plaintiffs and class members***


## CERTIFICATE OF SERVICE

I hereby certify that on November 7, 2019, a copy of the foregoing was filed

electronically with the Clerk of Court using the CM/ECF system. Notice of this filing will be

sent to all parties by operation of the Court's electronic filing system.


   /s/ Victor M. Jones                     
Victor M. Jones, LA Bar No. 34937, T.A.
Counsel for Plaintiffs and class members
**Southern Poverty Law Center**
201 St. Charles Avenue, Suite 2000
New Orleans, LA  70170
Phone: (504) 486-8982, ext. 1491
Facsimile: (504) 486-8947
victor.jones@splcenter.org