# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| **A. A.,** *by and through his mother,* **P.A.,** ET AL. | CIVIL ACTION |
| VERSUS | |
| **DR. COURTNEY N. PHILLIPS,** *in her official capacity, as Secretary of the Louisiana Department of Health*, ET AL. | NO. 19-00770-BAJ-SDJ |

## RULING AND ORDER

Before the Court is Plaintiffs' oral motion to conduct limited precertification class discovery, consisting of expert declarations, made at the May 18, 2023 oral argument on the parties' competing positions regarding the meaning of the terms "intensive care coordination," "crisis services," and "intensive behavioral services," and whether these terms can be defined in a manner that produces an ascertainable class under Federal Rule of Civil Procedure ("Rule") 23. For reasons set forth below, Plaintiffs' motion will be granted in part, and Plaintiffs will be allowed to conduct limited expert discovery aimed to define the term "intensive behavioral services." Discovery is not needed on the meaning of the terms "intensive care coordination" and "crisis services" because Defendants, Dr. Courtney N. Phillips, in her official capacity as Secretary of the Louisiana Department of Health, and the Louisiana Department of Health (collectively "LDH"), now concede that these terms, as currently defined by Plaintiffs, yield an "identifiable" class.

### I. BACKGROUND

Plaintiffs initiated this putative class action on November 7, 2019, challenging

whether LDH is fulfilling its statutory duty to provide medically necessary mental health interventions to Medicaid-eligible children with diagnosed mental health disorders. As detailed in this Court's prior orders, Plaintiffs consist of Medicaid-eligible children under the age of 21, diagnosed with mental and behavioral health disorders, for whom intensive home- and community-based behavioral health interventions have been prescribed. (Doc. 48, *hereinafter* "SAC," at ¶¶ 14-19, 83-124). Plaintiffs allege that instead of providing these intensive interventions as required by Title XIX of the Social Security Act, 42 U.S.C.A. § 1396a (the "Medicaid Act"), LDH offers only basic mental health interventions—medication management and infrequent counseling—with the result that Plaintiffs remain effectively untreated and, when they inevitably experience mental health crises, are forced to seek emergency care or, worse, psychiatric institutionalization. (SAC at ¶¶ 14-19, 83-124). Plaintiffs propose to represent a class of similarly situated Medicaid-eligible children spread across the state of Louisiana. (*Id.* at ¶ 22). Similar lawsuits are being pursued against state agencies across the country, and have been certified for class treatment.[1]

On May 25, 2021, this Court entered its Class Certification Order, certifying a class consisting of:

All Medicaid-eligible youth under the age of 21 in the State of Louisiana

---

[1] *See, e.g.*, *N.B. v. Hamos*, 26 F. Supp. 3d 756 (N.D. Ill. 2014) (Tharp, Jr., J.) (order certifying class to pursue Medicaid-eligible children's claims that Illinois's failure to provide home and community-based mental health interventions violated the Medicaid Act, Title II of the Americans with Disabilities Act, and the Rehabilitation Act); *S.R., by & through Rosenbauer v. Pennsylvania Dep't of Hum. Servs.*, 325 F.R.D. 103 (M.D. Pa. 2018) (Jones, III, J.) (same, Pennsylvania); *M. H. v. Berry*, No. 15-cv-1427, 2017 WL 2570262 (N.D. Ga. June 14, 2017) (Thrash, Jr., J.) (same, Georgia); *O.B. v. Norwood*, No. 15-cv-10463, 2016 WL 2866132 (N.D. Ill. May 17, 2016) (Kocoras, J.) (same, Illinois).

> (1) who have been diagnosed with a mental health or behavioral disorder, not attributable to an intellectual or developmental disability, and (2) for whom a licensed practitioner of the healing arts has recommended intensive home- and community- based services to correct or ameliorate their disorders.

(Doc. 78 at p. 1). The Court's May 25 Order further defined the term "intensive home- and community-based services (IHCBS)" to mean "intensive care coordination, crisis services, and intensive behavioral services and supports that are necessary to correct or ameliorate Plaintiffs' mental illnesses or conditions." (*Id.* at p. 2).

Over Plaintiffs' opposition, the U.S. Court of Appeals for the Fifth Circuit granted LDH's motion for leave to immediately appeal the Court's Class Certification Order. (Doc. 93). On appeal, LDH challenged every aspect of the Court's Rule 23 certification analysis. *See A.A., et al., v. Phillips, et al.*, No. 21-30580, Doc. 7 (5th Cir. Nov. 30, 2021) (LDH's opening brief on appeal). The Circuit, however, focused its review on just one element—ascertainability—and on February 13, 2023, issued its judgment and mandate vacating the Class Certification Order. (Doc. 149). In relevant part, the Circuit held:

> LDH argues that the class definition is not ascertainable because it is not clear which services are included in the term "IHCBS" and which are not. We agree. The district court defined IHCBS as "intensive care coordination, crisis services, and intensive behavioral services and supports that are necessary to correct or ameliorate [class members'] mental illness or conditions." These three terms are not defined, nor are they specific, billable behavioral health services ordered by a doctor or licensed mental health professional. Billable specialized behavioral health services include things like psychosocial rehabilitation or community psychiatric support and treatment. Here, it is not clear which care coordination services and behavioral services are "intensive," falling within the IHCBS definition, and which are not. Knowing which services IHCBS encompasses is essential to evaluating whether an individual is a class member.

3

(*Id.* at p. 9). The Circuit remanded the case to this Court, with instructions "to clarify which services are included in the term IHCBS," leaving for another day LDH's remaining objections to class certification. (*Id.* at p. 11).

Consistent with the Circuit's instructions on remand, on February 17, 2023 this Court ordered the parties to meet and confer in good faith to determine whether they could reach a stipulation specifying the behavioral health services included in the terms "intensive care coordination," "crisis services," and "intensive behavioral services." (Doc. 151 at p. 2). Alternatively, if unable to reach agreement regarding these terms, the Court ordered the parties to brief their respective positions. (*Id.*).

Unable to reach agreement, on March 17, 2023, Plaintiffs submitted their opening brief regarding the meaning of "intensive care coordination," "crisis services," and "intensive behavioral services," taking the position that each of these terms can be defined with reference to "service definitions from the Centers for Medicare and Medicaid Services (hereinafter 'CMS'), the federal agency that oversees Medicaid." (Doc. 156 at p. 1). In support, Plaintiffs proffered multiple CMS "Informational Bulletins," which, in relevant part, define the contested terms as follows:

> **Intensive Care Coordination:** a service utilizing a team-based, collaborative process for developing and implementing individualized care plans for children and youth with complex needs and their families, which includes assessment and service planning, accessing and arranging for services, coordinating multiple services, including access to crisis services, assisting the child and family to meet basic needs, advocating for the child and family, and monitoring progress.
>
> **Crisis Services (*a/k/a* "Mobile Crises Response"):** instrumental in defusing and de-escalating difficult mental health situations and preventing unnecessary out-of-home placements, particularly hospitalizations. Mobile crisis services are available 24/7 and can be provided in the home or any setting where a crisis may be occurring. In

4

>most cases, a two-person crisis team is on call and available to respond. In addition to assisting the child and family to resolve the crisis, the team works with them to identify potential triggers of future crises and learn strategies for effectively dealing with potential future crises that may arise.
>
>**Intensive Behavioral Services:** intensive in-home therapeutic interventions delivered to children and families in their homes and other community settings to improve youth and family functioning and prevent out-of-home placement in inpatient or psychiatric residential treatment facility settings. These services include individual and family therapy, skills training and behavioral interventions, as developed by a team that can offer a combination of therapy from a licensed clinician and skills training and support from a paraprofessional.

(*See id.* at pp. 3-5 (citing authorities)).

On March 31, 2023, LDH submitted its response to Plaintiffs' proposed definitions, conceding "that, for the purposes of this litigation, 'crisis services' refers to 'mobile crisis response.'" (Doc. 159 at p. 7). More cryptically, LDH indicated that it agreed to Plaintiffs' proposed definition of "intensive care coordination," albeit by a different name—specifically, "wraparound facilitation." (*Id.* at p. 5 ("Plaintiffs cite to other state programs for 'intensive care coordination' rather than refer to the Louisiana services that mirror those same benefits under the alternative name of 'wraparound facilitation.'")). Still, LDH objected to Plaintiffs' proposed definition of "intensive behavioral services," responding that it is "vague" and "will not assist the Court in identifying a putative class," and, that the only way to remove the ambiguity is to define this term with reference to "specific, billable behavioral health services recommended by providers" and already provided by LDH. (*Id.* at pp. 2-3, 8). Further, LDH complained that "Plaintiffs have not submitted any proof that providers prescribe services called … 'intensive behavioral services' to the Louisiana Plaintiffs."

5

(*Id.* at p. 4).

On April 7, 2023, Plaintiffs submitted their reply brief, arguing that LDH's demand for a class definition limited according to therapeutic interventions *already* provided by LDH impermissibly conflates the issues of ascertainability and liability, because the Medicaid Act expressly guarantees that Plaintiffs' are entitled to their prescribed therapeutic interventions *regardless* "whether or not such services are [currently] covered under [Louisiana's Medicaid] plan." 42 U.S.C. §1396d(r)(5); *see S.D. ex rel. Dickson v. Hood*, 391 F.3d 581, 589 (5th Cir. 2004) ("The natural reading of § 1396d(r)(5)'s phrases is that all of the health care, services, treatments and other measures described by § 1396d(a) must be provided by state Medicaid agencies when necessary to correct or ameliorate unhealthful conditions discovered by screening, regardless of whether they are covered by the state plan."). Plaintiffs further argued that any class definition limited by services already provided by LDH would meaningfully impair their ability to pursue relief on behalf of Louisiana children that are not currently receiving the behavioral health interventions that the Medicaid Act requires. Plaintiffs' explained:

> By defining intensive care coordination, crisis services, and intensive behavioral services according to the CMS definitions, Plaintiffs have clarified what they are seeking in this action – these three services, delivered together in a highly coordinated way, to children with intensive mental and behavioral health needs – in a manner that satisfies their ascertainability burden at this stage of the litigation. … Any attempt to define the class according to services currently provided in Louisiana would not accurately capture only those children and youth with intensive needs, and it would also leave out children and youth with intensive needs who are not currently receiving services. Moreover, Plaintiffs maintain that the issue of whether Louisiana's existing Medicaid services constitute intensive care coordination, crisis, and

6

intensive behavioral services is an ultimate question of liability.
(Doc. 160 at p. 4).

On May 18, 2023, the Court heard argument from the parties. (Doc. 172). Plaintiffs restated their position that, for purposes of ascertainability, the Court should adopt the proposed definitions of "intensive care coordination," "crisis services," and "intensive behavioral services" set forth in their March 17 brief. As an intermediate alternative, Plaintiffs moved for leave to conduct limited precertification discovery to bolster their proposed definitions with ground-level data, consisting of "expert declarations that would more fully describe the services [at issue], who they're for, what they do, how they differ [from what LDH already provides]." (Doc. 174 at p. 13:7-10). Plaintiffs further proposed that upon developing this discovery, they will "come to the Court with an amended complaint and/or a renewed motion for class certification that includes more of the facts that we're talking about." (Doc. 174 at pp. 12:23-13:2). LDH, for its part, restated its concerns regarding Plaintiffs' proposed definitions, and flatly opposed allowing Plaintiffs to conduct discovery.

Still, the exercise was not entirely in vain. First, at the May 18 argument LDH admitted (again) that it understands and does not dispute Plaintiffs' proposed definition of "crisis services." (Doc. 174 at p. 21:18-22 ("But for the purposes of this litigation, LDH believes that the parties have had a meeting of the minds to say we're talking about mobile crisis response when we talk about crisis services.")). Second, LDH inched closer to conceding that it also does not oppose Plaintiffs' proposed definition of "intensive care coordination." (Doc. 174 at p. 30:24-31:4 ("Intensive care

7

coordination,' we obviously call that different things, but I think we're both getting at the same type of service")). As such, by the end of the hearing, according to LDH's own view, the only term still in dispute is "intensive behavioral services." (*Id.* at 31:5-9). At the conclusion of argument, the Court ordered post-hearing briefs from the parties regarding Plaintiffs' request for limited discovery. (*Id.* at p. 32:14-24).

LDH filed its post-hearing brief first, on May 25. Significantly, LDH affirmed (with absolute clarity this time) that Plaintiffs' proposed definitions of "intensive care coordination" and "crisis services" each yield an "identifiable" class, and that the parties can "constructively move forward" without additional discovery aimed to flesh out the meaning of these terms. (Doc. 175 at pp. 1-2). Still, LDH contests Plaintiffs' proposed definition of "intensive behavioral services," insisting that even limited discovery to refine this term is "a waste of time" because "Plaintiffs should be capable of simply identifying the 'intensive' services recommended for them by their providers and do not need expert testimony to refer to their own medical records." (*Id.* at p. 4).

Plaintiffs' submitted their post-hearing brief on May 26, re-stating their position that "they are not seeking the services currently offered by LDH," and, as such, limited expert discovery will clarify the objective criteria for class membership. (Doc. 176 at pp. 2-3). Plaintiffs specifically propose:

> to obtain a limited number of expert declarations regarding intensive care coordination, crisis services, and intensive behavioral services. These declarations aim to supplement CMS's definitions of these services. The scope of the proposed expert declarations will be limited to explanations of the following: (a) CMS's service definitions; (b) the substance of the services; (c) the children for whom the services are designed and necessary; and (d) how these services differ from services designed for children with less intensive needs.

8

(*Id.* at pp. 3-4).

## II. DISCUSSION

On remand from the Circuit, the sole issue before the Court is whether Plaintiffs are capable of defining a class that is "clearly ascertainable"—in other words, one that is defined "mechanical[ly]" by reference to "objective" criteria," and *not* dependent on an "individualized 'causal' determination on the merits." *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 640 (5th Cir. 2012). In making this determination, the Court may, of course, "sanction controlled discovery at the certification stage." *Unger v. Amedisys Inc.*, 401 F.3d 316, 321 (5th Cir. 2005) (citing Fed. R. Civ. P. 23 Advisory Committee's Note to 2003 amendments); *see also* Discovery In Class Actions, 10 FED. PROC., L. ED. § 26:14 (2023) ("[P]laintiffs seeking class certification are entitled to precertification discovery to establish the record the district court needs to determine whether the requirements for a class action suit have been met.").

Here, for multiple reasons, the Court determines that this case would benefit from precertification class discovery, as have other class action challenges to Medicaid-funded intensive behavioral health interventions for children, in jurisdictions across the country. *See, e.g.*, *C.A. through P.A. v. Garcia*, No. 23-cv-9, Doc. No. 34 (S.D. Iowa Mar. 28, 2023) (scheduling order setting deadlines for precertification expert discovery); *M. J. v. D.C.*, No. 18-cv-1901 (D.D.C. Feb. 21, 2020) (minute entry setting deadlines for precertification discovery).

First, despite LDH having previously argued (on appeal) that the Court's class definition is not ascertainable because it incorporated the terms "intensive care

9

coordination, crisis services, and intensive behavioral services," (Doc. 149 at p. 9), LDH now admits that, having conferred with Plaintiffs, two of these three terms—"intensive care coordination" and "crisis services"—*are* "identifiable," thereby yielding an ascertainable class. (Doc. 175 at p. 2). The only issue left unresolved is the definition of "intensive behavioral services," with LDH taking the position that this term must be limited according to discrete services already provided under Louisiana's Medicaid program, (Doc. 159 at p. 2, 8-9), and Plaintiffs countering that any such limitation would meaningfully impair their ability to pursue relief on behalf of Louisiana children that are not currently receiving the behavioral health interventions guaranteed by Medicaid *regardless* whether they are currently offered by LDH. (Doc. 160 at p. 4). Plaintiffs obviously have the better end of the law and the argument: to the point, limiting the class according to therapeutic services already provided by LDH would render "meaningless" the Medicaid Act's express guarantee that medically necessary behavioral health interventions "must be provided whether or not [they are] covered under the state plan." *S.D. ex rel. Dickson v. Hood*, 391 F.3d at 589 (interpreting 42 U.S.C. §§ 1396d(a) & (r)(5)). Further, the Court agrees with Plaintiffs that limited precertification discovery will put a finer point on Plaintiffs' class allegations, allowing the Court to better understand Plaintiffs' proposed "objective criteria for class membership" as it relates to the appropriate definition of "intensive behavioral services." (*See* Doc. 176 at p. 3).

Second, allowing limited precertification discovery here eliminates LDH's complaint that "Plaintiffs have not submitted any proof that providers prescribe

10

services called ... 'intensive behavioral services.'" (*Id.* at p. 4). LDH cannot have it both ways, complaining of a lack of evidence to certification, then objecting when Plaintiffs request the opportunity to develop such evidence.

Third, as is clear from the parties' briefing and representations to the Court at oral argument, all sides agree that the issues presented here are substantial, and deserving of a balanced and close review. Plaintiffs' and the putative class members they seek to represent are, by *any* definition, among the most at-risk and marginalized children in Louisiana—specifically, Medicaid recipients contending with serious behavioral health disorders. Presumably, the Court could now re-certify a class comprised solely of Medicaid-eligible Louisiana youth diagnosed with a mental health or behavioral disorder for whom a licensed practitioner has recommended "intensive care coordination" and/or "crisis services," based on LDH's concession that a class comprised of such children is "identifiable" as these terms are now defined by Plaintiffs. (Doc. 175 at p. 2). But even LDH's briefing makes clear that simply omitting the term "intensive behavioral services" from the class definition may result in children requiring serious behavioral health interventions being left out. (*See* Doc. 159 at pp. 7-8 (setting forth LDH's proposed list of billable interventions comprising "intensive behavioral services"). Better to take the time now to develop the evidence required for the Court to make an informed decision, even if limited discovery delays the re-certification decision.

Finally, on a related note, this case is now almost four years old. It is set for trial in February 2025. Plaintiffs and LDH each deserve a fair and efficient

11

adjudication of the issues presented, and the Court is committed to ensuring that the present trial date is kept, whether or not this case ultimately proceeds as a class action. The Circuit limited its review of the Court's original Certification Order exclusively to the issue of ascertainability, despite LDH having raised multiple additional challenges on appeal. Even though LDH has conceded that Plaintiffs' new definitions of "intensive care coordination" and "crisis services" yield an identifiable class, it makes no secret of its plan to appeal whatever re-certification order the Court may enter. Should that order ultimately include a class that includes Medicaid-eligible Louisiana youth requiring "intensive behavioral services," it is this Court's duty to ensure that the record is sufficiently developed to allow the Circuit to conduct its review of ascertainability, and thereafter, as necessary, to review LDH's additional challenges to certification.

In sum, LDH concedes that Plaintiffs' proposed definitions of "intensive care coordination" and "crisis services" yield an "identifiable" class. (Doc. 175 at p. 2). As such, "[d]iscovery is not required" as to these terms. (*Id.* at p. 3). The Court further determines that, for the reasons set forth herein, limited expert discovery on the issue of the definition of "intensive behavioral services" will aid the Court's assessment of re-certification. As such, Plaintiffs and LDH will be allowed to conduct limited expert discovery, and Plaintiffs will be allowed to resubmit their request for class certification, as set forth below. *See Unger*, 401 F.3d at 321.

### III.   CONCLUSION

Accordingly,

**IT IS ORDERED** that Plaintiffs' oral motion to conduct limited

precertification discovery made at the May 18, 2023 oral argument be and is hereby **GRANTED IN PART**, and that Plaintiffs shall be permitted to conduct limited expert discovery aimed to define the term "intensive behavioral services" for purposes of this litigation. Plaintiffs' limited precertification discovery shall consist of not more than two expert declarations, the scope of which shall be limited to explanations of the following: (a) CMS's service definition(s) of the term "intensive behavioral services"; (b) the substance of "intensive behavioral services"; c) the children for whom "intensive behavioral services" are designed and necessary; and (d) how these services differ from services designed for children with less intensive needs. (*See* Doc. 176 at pp. 3-4). Plaintiffs shall serve their expert declaration(s) on LDH within 30 days of the date of this Order.

**IT IS FURTHER ORDERED** that within 30 days of the date of service of Plaintiffs' expert declaration(s), LDH shall be permitted to serve Plaintiffs not more than two rebuttal declarations, limited to the same scope set forth above.

**IT IS FURTHER ORDERED** that within 21 days of receiving LDH's rebuttal declarations (if any), Plaintiffs shall submit a motion to amend the Court's original class certification order (Doc. 78) to conform the proposed class to the definitions of "intensive care coordination," "crisis services," and "intensive behavioral services" developed on remand from the Circuit. Consistent with the Circuit's instructions on remand, Plaintiffs' motion to amend shall be limited solely to the issue of ascertainability, and shall not exceed 15 pages. LDH's opposition to Plaintiffs' motion to amend, if any, shall be due within 14 days of receiving Plaintiffs' motion and shall

not exceed 15 pages. No reply briefing will be allowed.

**The deadlines set forth herein will not be modified absent a showing of good cause and any party's unexcused failure to satisfy the deadlines set forth herein will result in waiver.**

        Baton Rouge, Louisiana, this 14th day of June, 2023

        _____
        **JUDGE BRIAN A. JACKSON**
        **UNITED STATES DISTRICT COURT**
        **MIDDLE DISTRICT OF LOUISIANA**